**\*NOT FOR PUBLICATON\***

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMERICAN CENTER FOR CIVIL JUSTICE, INC., <br><br> Appellant, <br><br> v. <br><br> JOSHUA M. AMBUSH, <br><br> Appellee. | No. 21-02267 (FLW) <br><br> **OPINION** |

**WOLFSON, Chief Judge:**

The United States Bankruptcy Court for the District of New Jersey ("USBC") expunged a $31.8 million claim filed by Appellee Joshua M. Ambush in Appellant American Center for Civil Justice, Inc.'s ("ACCJ") Chapter 11 proceeding. *In re American Center for Civil Justice, Inc.*, No. 18-01273, 2020 WL 165224, at \*1 (D.N.J. Mar. 23, 2020) [hereinafter *In re ACCJ*]. Although the USBC granted summary judgment against Ambush, ACCJ challenges five adverse determinations the court made regarding its counterclaim, all concerning a Settlement Agreement, which the parties entered in 2012 to forestall certain future litigation. For the following reasons, I **AFFIRM** the USBC's Order and **DISMISS** ACCJ's appeal.

I.   **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

   *A. The Parties*

Debtor in the underlying bankruptcy proceeding is ACCJ, a New Jersey nonprofit which pursues litigation on behalf of victims of state-sponsored terrorism. *In re ACCJ*, 2020 WL 1652244, at \*2. ACCJ retains counsel at its own expense, and if it wins, the victims donate 20%

1

of their net recovery to the organization. *Id.* The victims also reimburse costs. *Id.* ACCJ memorializes its relationship with the victims in a Claimant-Center Agreement. *Id.* "Although not entirely clear," at some point in the early 2000s, Ambush represented a number of ACCJ's victims in a case called *Vega-Franqui, et al. v. Syrian Arab Republic, et al.*, arising out of a deadly terrorist attack on passengers at the Lod Airport near Tel Aviv, Israel, in 1972.[1] The "*Franqui* Action" beget years of highly contested litigation between ACCJ and Ambush, including this dispute. Because the parties are familiar with the facts, and I write primarily for them, I recount only what is necessary to decide the present appeal. *Xiao Xia Chen v. Att'y Gen. of U.S.*, 354 Fed. App'x. 731, 732 (3d Cir. 2009); *United States v. Palmisano*, 559 Fed. App'x. 135, 136 (3d Cir. 2014).

    B.   *Prior and Related Litigation*

***First***, in a 2009 case, ACCJ alleged that Ambush "deceptively convinced" Lod Airport victims "to revoke powers of attorney with ACCJ and to sign retainer agreements with [him]." *In re ACCJ*, 2020 WL 1652244, at *2. As part of these retainers, victims agreed to pay Ambush 10% above the 20% they already owed to ACCJ in the event of a recovery. *Id.* ACCJ likewise disputed Ambush's compensation pursuant to a 2008 treaty between the United States and Libya whereby Libya, a defendant in the *Franqui* Action, agreed to create a settlement fund to compensate Lod Airport victims. After three years of litigation, in 2012, ACCJ and Ambush entered a Settlement Agreement terminating their relationship, to the extent it still existed, and agreeing not to disparage each other, interfere with client relationships, or pursue further litigation related to *Franqui*. Relevant here, Paragraph 6 of the Agreement provides that:

> Neither Ambush, on the one hand, or the Center, Dr. Engelberg, or Perr, on the other hand, nor any person or entity acting with their knowledge or under their direction or control, shall encourage, sponsor, initiate, finance, including, but not

---

[1] Beyond this, the extent of Ambush's relationship with ACCJ remains difficult to ascertain. As the USBC noted, the Settlement Agreement is the only written document they have ever submitted defining their work together.

> limited to, the payment of attorneys' fees or costs, any form of claim or litigation against the other arising out of or related to the subject matter of the Litigation or the Franqui Litigation or the services performed by any of the Parties in connection with the Franqui Litigation or the administrative claims of any of the plaintiffs in the Franqui Litigation after that Litigation was dismissed. In the event of any breach of this provision, the non-breaching Party shall be entitled to recover from the breaching Party liquidated damages in the amount of $600,000 plus reasonable attorneys' fees and expenses incurred in enforcing the remedy provided for under this Paragraph 6. Any action to enforce the remedy provided under this Paragraph 6 shall be filed in the United States District Court for the District of Columbia (the "Court") and shall include the request that the case be assigned to the judge of that Court who presided over the Litigation. The Parties consent to the exercise of jurisdiction over them by the Court in any such proceeding filed to enforce the remedy provided under this Paragraph 6.

*In re ACCJ*, 2020 WL 1652244, at *4. The Settlement Agreement is an enforceable contract governed by basic contract principles. *Alford v. Kuhlman Elec. Corp.*, 716 F.3d 909, 912 (5th Cir. 2013); *Welch & Forbes, Inc. v. Cendant Corp.*, 233 F.3d 188, 192-93 (3d Cir. 2000). As such, it "can be enforced by an ordinary action for breach of contract." *VoiceStream Minneapolis, Inc. v. RPC Props., Inc.*, 743 N.W.2d 267, 271 (Minn. 2008) (citation omitted); *Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007) (calling such agreements "binding and conclusive"); *Beazer East, Inc. v. Mead Corp.*, 412 F.3d 429, 436 (3d Cir. 2005).

**Second**, in 2010, two Lod Airport victims sued Ambush in the District of Puerto Rico to recoup attorney fees they paid. Entitled the "Berganzo Action," a jury found that Ambush secured his retainer with these plaintiffs by deceit, nullified the agreement, and ordered him to pay $2 million. *In re ACCJ*, 2020 WL 1652244, at *3. The First Circuit affirmed the jury's decision. *Estate of Berganzo-Colon v. Ambush*, 704 F.3d 33 (1st Cir. 2013). The Settlement Agreement splits this liability evenly between ACCJ and Ambush.

**Third,** around the same time as the Berganzo Action, a separate group of Lod Airport victims sued Ambush in Puerto Rico, this time for $10 million. In this case, which the parties refer to as the "Domenech Action," the Superior Court adopted a stipulation "ordering distribution of

all monies to which ACCJ had no claim, that is, 80% of the $10 million, except in the case of a minor who was allowed 100% of his claim." *In re ACCJ*, 2020 WL 1652244, at *4. As to the remaining 20%, or $2 million, the court awarded $1,107,142.86 to ACCJ, which equaled the donations due to it from victims who signed Claimant Agreements (excluding the minor), and retained *in custodia legis* $857,142.86, which equaled the donations of the victims who had not signed Claimant Agreements. *Id.* The USBC called the distribution of funds in the Domenech Action "Pot One" and "Pot Two," with Ambush admitting that he has no legal entitlement to Pot One. Ambush sought to intervene in the Domenech Action in 2013 to claim fees from his former clients out of Pot Two, *id.* at *12, ACCJ opposed, and his motion was denied on May 21, 2014.

*Fourth*, and finally, Ambush filed suit against ACCJ in 2015 in the District Court for the District of Columbia. *See, e.g.*, *Ambush v. Engelberg*, No. 15-01237, 282 F. Supp. 3d 58 (D.D.C. 2017) (rejecting Ambush's motion to disqualify ACCJ's attorneys). Entitled the "2015 Action," Ambush sought to enforce the Settlement Agreement and hold ACCJ accountable for various breaches. He also alleged RICO violations. His complaint spanned 12 counts and 76 pages, with the first four covering the breaches and the latter seven covering RICO. Like much of this case, the details of the 2015 Action remain unclear. But what is clear is that the RICO allegations encompass facts, events, and occurrences largely separate from the *Franqui* Action, some occurring after the date of the Settlement Agreement altogether, as the USBC reiterated below. Case No. 18-01273, ECF No. 82, at 20-21. For instance, Ambush alleges that ACCJ is a sham corporation, Compl., ¶ 33, with a "dummy board[]," *id.* ¶ 43, which committed *inter alia* wire fraud, mail fraud, tax fraud, and obstruction of justice by donating money to Chabad, a religious group in Puerto Rico that purportedly does not assist victims of terrorism, *id.* ¶¶ 191-92, 218, practicing law without a license, *id.* ¶ 202, representing a client after she died against her wishes,

4

*id.* ¶ 205, "deliberately exclud[ing]" victims from a 2014 recovery related to a terrorist attack at the "Alavi building . . . in New York City," *id.* ¶ 207, and "secretly engag[ing] substitute counsel to wrest control away from the attorney who did all the work" in a case entitled *Higgins v. Islamic Republic of Iran*, "to avoid paying the attorney fees." *Id.* ¶ 214.

    C.  The USBC Proceeding/Decision

On March 23, 2018, ACCJ filed for Chapter 11 bankruptcy in the District of New Jersey, which stayed the 2015 Action. On April 5, 2018, Ambush filed a claim for $31.8 million, charging ACCJ with the same violations as the 2015 Action and attaching that complaint as the only supporting document. On June 12, 2018, ACCJ filed the adversary proceeding underlying this appeal, (1) objecting to Ambush's claim and (2) advancing a counterclaim for breach of the Settlement Agreement, which again specified that the parties could not pursue litigation against each other arising solely out of the *Franqui* Action. ACCJ also sought to limit Ambush's claim to $3,626,212.80. Ambush opposed. After "numerous settlement conferences, discovery conferences, and on the record hearings on these matters," the parties cross-moved for summary judgment on all issues. *In re ACCJ*, 2020 WL 1652244, at *2.

The USBC expunged Ambush's claim on March 23, 2020, and found ACCJ not liable for any alleged breach. *Id.* at *14. That decision remains unchallenged on appeal. More relevant, on January 27, 2021, the USBC rejected ACCJ's counterclaim, calling it "gamesmanship" and concluding that the organization's "retaliatory tactics have only the most tenuous legal basis." Case No. 18-01273, ECF No. 82, at 3. In particular, the USBC construed ACCJ's counterclaim to assert just "two cognizable claims": whether Ambush's motion to intervene in the Domenech Action violates the Settlement Agreement and whether Ambush's RICO claims do as well. *Id.* at 4. In so limiting the counterclaim, the court rejected ACCJ's attempt to increase the number of alleged

5

breaches to 27, which the organization improperly derived from the number of counts in the 2015 Action, the number of times Ambush repeated those counts in his Chapter 11 claim, and the number of appeals Ambush took following denial of his motion to intervene. *Id.* at 13-14. The court then found that the applicable statute of limitations bars the Domenech Action claims; even if not, those claims do not constitute breach; and Ambush's RICO claims "[are] not related to the settled matters." *Id.* at 4.

In its Order, the USBC first applied D.C.'s three-year statute of limitations to bar ACCJ's claims as to the Domenech Action, which the organization filed five years after Ambush moved to intervene. D.C. Code § 12-301(7). The court reasoned that the Settlement Agreement includes a choice of law provision mandating D.C. law, which in turn distinguishes between substantive and procedural rules and directs courts to apply the procedural rules of the forum state. Because statutes of limitation are widely regarded as procedural rather than substantive, New Jersey law applies even under D.C. choice of law principles. Applying (what it believed to be) applicable New Jersey law, the court then turned back to D.C.'s three-year statute of limitations, because "New Jersey has no substantial interest in garden variety breach of contract claims arising from a settlement agreement in a District of Columbia lawsuit between a resident of Maryland and a not-for-profit corporation organized in New York, which lawsuit stemmed from actions taken in Puerto Rico." *Id.* at 15-16.

Notwithstanding that statutory bar, the USBC held that ACCJ "failed [on the merits] to sustain a claim against Ambush as to the Domenech Action." *Id.* at 18. According to the court, Ambush filed his intervention motion "to protect his own position" as to the fees held *in custodia legis*, not "pursue a claim" against ACCJ. *Id.* at 19. "Each party had a claim against the *estate*" for such fees, "not each other." *Id.* (emphasis in original). Further, the court recognized, Pot Two

6

contains under $1 million, meaning that both sides could not prevail at once, which placed them "in a quasi-adversarial position," but that alone did not "lead to a violation of the Settlement Agreement." *Id.* Critical to the court's conclusion on this issue was its view that it treated Ambush's motion to intervene the same as a motion by ACCJ for a declaration that Ambush had no entitlement to the fees held *in custodia legis*: both parties believed they had a right to that money, and sought to defend their respective positions, even if doing so ultimately meant that the other may lose. *Id.* at 17-19.

Next, the USBC found that Ambush did not breach the Settlement Agreement by filing the 2015 Action. According to the court, this followed logically from the Agreement, since an action seeking to enforce it cannot at once breach it, and from the Agreement's "plain language," which provides that "[a]ny action to enforce the remedy provided in Paragraph 6 shall be filed" in D.C. *Id.* at 20. The court similarly held that Ambush properly included the RICO claims in the 2015 Action. *Id.* at 21. Although these constitute "claims" against ACCJ in the sense of the Settlement Agreement, they do not "arise out of or are related to . . . the *Franqui* Litigation," but rather "are based on actions taken by ACCJ and others in circumstances separate and apart from [it]." *Id.* at 22-23 (noting, at the same time, that Ambush's complaint is "so unartfully drafted as to be nearly indecipherable"). The RICO claims also depend on conduct post-dating the Agreement, despite the fact that the Agreement releases "any and all matters and things that have occurred as of the effective date of [it]." *Id.* at 24. Finally, because the court construed Ambush's Chapter 11 claim as "based entirely upon the 2015 Action," it did not separately run afoul of the Settlement Agreement.

    D.  Issues on Appeal

ACCJ now appeals the USBC's Order dismissing its counterclaim. First, ACCJ argues that the USBC applied the wrong statute of limitations. Second, it contends, the USBC erred in concluding that Ambush's motion to intervene in the Domenech Action, his 2015 Action, and his Chapter 11 claim do not violate the Settlement Agreement. And third, it objects to the USBC's determination that actions arising in the same case or based on the same facts constitute a single breach rather than multiple breaches.

## II.     LEGAL STANDARD

The USBC has original jurisdiction over this matter. 28 U.S.C. §§ 157(a)-(b). The USBC's Order granting summary judgment on ACCJ's counterclaim is also final and appealable. *Delightful Music Ltd. v. Taylor (In re Taylor)*, 913 F.2d 102, 104 (3d Cir. 1990) (holding that an order is final and appealable if it "fully and finally resolved a discrete set of issues, leaving no related issues for later determination"); *Batt v. Scully*, 168 B.R. 541, 544-45 (D.N.J. 1994). This Court in turn has appellate jurisdiction. 28 U.S.C. § 158(a)(1). I review the USBC's legal conclusions *de novo*, but its factual findings "only for clear error—in other words, with a serious thumb on the scale for the bankruptcy court." *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 966 (2018). A factual finding is clearly erroneous if it "either is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1223 (3d Cir. 1995) (quotations omitted). "If the [bankruptcy] court's account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985).

It follows that, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574; *Gessman v. United States (In re Applied Paging Techs., Inc.)*, 250 B.R. 496, 499 (D.N.J. 2000) ("[A] mere difference [of] opinion regarding the resolution of a factual issue will not permit reversal under the clearly erroneous standard."). "This is so even when the [bankruptcy] court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Anderson*, 470 U.S. at 574. And the District Court may affirm "for any reason supported by the record," even one on which the USBC did not rely. *Otto v. Pa. State Educ. Ass'n-NEA*, 330 F.3d 125, 140 n.17 (3d Cir. 2003).

### III. DISCUSSION

#### A. The Statute of Limitations

The parties first dispute whether D.C.'s three-year statute of limitations or New Jersey's six-year statute of limitations applies to ACCJ's claim regarding Ambush's intervention motion in the Domenech Action. I start with the Settlement Agreement, as the USBC did. The Agreement contains a forum selection provision providing that "[a]ny action to enforce the remedy provided under this Paragraph 6 shall be filed in the United States District Court for the District of Columbia (the "Court") and shall include the request that the case be assigned to the judge of that Court who presided over the Litigation." Case No. 18-01273, ECF No. 67-4, Ex. 1, Para. 6. The Agreement also contains a choice of law provision providing that "[t]his Agreement shall be construed and applied in accordance with the laws of the District of Columbia." *Id.*, Para 9.

The USBC correctly applied the choice of law clause in the proceeding below, including D.C.'s choice of law rule, to determine which state's statute of limitations governs ACCJ's counterclaim. *Id.*, ECF No. 82, at 14-15. Indeed, pursuant to "customary choice of law principles"

9

in D.C., "the laws of the forum [*i.e.*, New Jersey] . . . apply to matters of procedure," such as a statute of limitations. *Huang v. D'Albora*, 644 A.2d 1, 4 (D.C. 1994); *see also Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179 (3d Cir. 1991) ("[C]hoice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express."); *Am. Energy Techs., Inc. v. Colley & McCoy Co.*, No. 98-398, 1999 WL 301648, at *2 (D. Del. Apr. 15, 1999) (collecting cases).

Once "in" New Jersey, the USBC applied *McCarrell v. Hoffman-La Roche, Inc.*, 227 N.J. 569 (2017), to nevertheless select D.C.'s shorter limitations period. Here is where I find that the USBC erred. *McCarrell* is about "general choice-of-law principles" *in the state of New Jersey*. *Id.* at 584. To that end, it (1) creates a presumption in favor of the forum state, pursuant to Restatement (Second), § 142(2)(a); (2) holds that, if the forum state "has a substantial interest in the maintenance of the claim," then "the inquiry ends" there; (3) determines whether another state has a more substantial relationship using seven traditional factors listed in Restatement (Second), § 6(2); and (4) clarifies that, while the "presumption in favor of a forum state *with a substantial interest* . . . can only be overcome by exceptional circumstances that would render that result unreasonable . . . , when the forum state has *no interest* in the litigation and the claim is barred by another state's statute of limitations, the forum state generally should not entertain the claim."[2] 227 N.J. at 592-97 (emphasis added). In other words, *McCarrell* instructs courts applying *New*

---

2   The USBC's analysis may well be sound if there were no choice of law provision in the Settlement Agreement and *McCarrell* governed the analysis. As the USBC wrote, "New Jersey has no substantial interest in garden variety breach of contract claims arising from a settlement agreement in a District of Columbia lawsuit between a resident of Maryland and a not-for-profit corporation organized in New York, which lawsuit stemmed from actions taken in Puerto Rico." Case No. 18-01273, ECF No. 82, at 16. New Jersey is related to this dispute only insofar as ACCJ has some business operations in the state and filed its Chapter 11 proceeding there. Likewise, "[i]t was not reasonably foreseeable . . . that ACCJ would file a bankruptcy and through that bankruptcy would seek to revive a claim by extending the applicable limitations period through that alternate forum." *Id.* at 17. "Absent ACCJ's bankruptcy filing, this matter could not have been filed in any court in New Jersey due to the choice of forum clause." *Id.* at 16. Nevertheless, the Settlement Agreement includes a choice of law provision opting into D.C. law, including D.C.'s choice of law rules.

10

*Jersey choice of law rules* how to select the appropriate statute of limitations; it does not concern New Jersey's actual procedural law. *Id.* at 583 ("This appeal raises the question: What are *our* choice-of-law rules in determining the applicable statute of limitations?") (emphasis added).

The upshot is that the USBC applied one too many choice of law rules in the proceeding below. The court correctly started with D.C.'s choice of law rule regarding which state's procedural law to select, but instead of ending its inquiry with that answer, it then applied New Jersey's choice of law rule, which led it back to D.C.'s procedural law. The USBC should not have applied *McCarrell* at all. Accordingly, I **REVERSE** the USBC's decision to adopt D.C.'s three-year limitations period. New Jersey's six-year limitations period is appropriate instead. *See, e.g.*, N.J.S.A. § 2A:14-1; *R.C. Beeson, Inc. v. Coca Cola Co.*, 337 Fed. App'x. 241, 244 (3d Cir. 2009) ("New Jersey law provides a six-year statute of limitations 'for recovery upon a contractual claim or liability.'") (citation omitted); *Troise v. Extel Commc'ns, Inc.*, 345 N.J. Super. 231, 237-38 (App. Div. 2001) (same); *A.J. Tenwood Assocs. v. Orange Senior Citizens Hous. Co.*, 200 N.J. Super. 515, 523 (App. Div. 1985) (same). While I recognize that this result may strike Ambush as unfair,[3] since this matter is justiciable in a New Jersey forum only because ACCJ filed for Chapter

---

3    The USBC also suggested that it had the equitable power to adjust the limitations period "to bar ACCJ's claims of breach arising out of the Domenech Action," Case No. 18-01273, ECF No. 82, at 17-18, pursuant to its authority to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Code]." 11 U.S.C. 105(a). This is a still more complicated question. Equitable determinations are reviewed for abuse of discretion, which is deferential. *In re Sheckard*, 394 B.R. 56 (Bankr. E.D. Pa. 2008). Further, under New Jersey law, procedural statutes of limitation are not set in stone but flexible. *Gaskill v. Citi Mortg., Inc.*, 428 N.J. Super. 234, 245 (App. Div. 2012); *LaFage v. Jani*, 166 N.J. 412, 422 (2001); *R.A.C. v. P.J.S., Jr.*, 192 N.J. 81, 98 (2007) ("Procedural statutes of limitations are not construed strictly, but rather, flexibly, guided by principles to achieve a just end."). At the same time, the USBC does not have unlimited equitable power: it may not rewrite contracts or create substantive rights not available under the Bankruptcy Code. *In re Morristown & Eerie R.R. Co.*, 885 F.2d 98, 100 (3d Cir. 1989); *Nextel Retail Stores, Inc. v. LTCW Trust (In re Telephone Warehouse, Inc.)*, 124 Fed. App'x. 724, 728 (3d Cir. 2005). These principles seem to conflict in this case: ACCJ may have engaged in forum shopping in filing for Chapter 11 in New Jersey, but shortening the New Jersey statute of limitations period to prevent a counterclaim arising out of Ambush's intervention in the Domenech Action may undermine the choice of law clause in the Settlement Agreement. Because I reject ACCJ's Domenech Action claim on the merits in any case, *see infra*, I need not comment further on this issue.

11 there, it is a consequence of a bargained-for contractual provision in the Settlement Agreement and the fact that ACCJ is now in bankruptcy. Because a six-year limitations period applies, ACCJ's counterclaim as to Ambush's intervention in the Domenech Action is not time-barred.

### B. The Motion to Intervene in the Domenech Action

Regardless of the statute of limitations, the USBC went on to find that Ambush did not violate the Settlement Agreement when he moved to intervene in the Domenech Action in 2013. Case No. 18-01273, ECF No. 82, at 18-20. In reaching its decision on this issue, the USBC relied on reasoning from *In re ACCJ*, where it rejected *Ambush's* claim that a motion ACCJ filed in response to his intervention violated the Settlement Agreement. 2020 WL 1652244, at *13.

Ambush sought to intervene in the Domenech Action to "assert his entitlement" to approximately $1 million in attorney fees. *Id.* at *12. Consequently, ACCJ moved for an affirmative ruling that Ambush was not so entitled. *Id.* at *13. Ambush in turn took the position that ACCJ's request "served no purpose" other than to litigate a claim against him in violation of the Settlement Agreement, since "[he] only sought fees separate from and in addition to those sought by ACCJ," *i.e.*, from victims who had not signed Claimant Agreements. *Id.* Objecting to Ambush's characterization of its request, ACCJ argued that "it made no claim that Ambush was not entitled to the 10% that he claimed he was owed," but was "merely trying to protect its own claims to the money." *Id.* In its decision, the USBC first acknowledged that "ACCJ was claiming an entitlement to *all* the money in both Pot One and Pot Two," such that "[a]ny amount paid to Ambush would decrease the amount available to pay ACCJ." *Id.* (emphasis in original). Ambush also sought the funds in Pot Two regardless of whether they belonged to ACCJ, and he sought to stay the litigation pending disposition of his motion, which would delay ACCJ's access to Pot One, over which Ambush admitted that he had no legitimate claim. Likewise, since Ambush asserted a

claim exceeding the total balance in Pot Two, it could only be satisfied in full with partial payment from Pot One. *Id.* at *13-14. For these reasons, the USBC viewed "ACCJ's filing of the Motion in Compliance with Order to be defensive in nature, done to protect its own claim to Pot One and Pot Two, and not to assert any independent claim against Ambush. Therefore, a violation of the Settlement Agreement did not occur." *Id.*

In the proceeding underlying this appeal, the USBC interpreted Ambush's motion to intervene in the same manner and as having "the same purpose" as ACCJ's: Ambush sought to recoup the funds held *in custodia legis* from clients who did not sign a Claimant Agreement, and "protect his own position" by bringing a claim "against the estate" not ACCJ, even if he sought more money than existed in Pot One, thereby necessarily placing the parties "in a quasi-adversarial position." Case No. 18-01273, ECF No. 82, at 19. ACCJ's "own words and actions" underscore this point: "[w]ith regard to [Ambush's] Motion for Intervention, there is no claim against the Center." *Id.* ACCJ responds that the USBC characterized Ambush's motion as asserting claims against ACCJ when it decided *In re ACCJ*. While there is some language along those lines in that decision, and the USBC concedes that it "struggled with Ambush's intentions," Case No. 18-01273, ECF No. 82, at 19, I do not find that dispositive here. Compared to the language in the Settlement Agreement, which precludes "any form of claim or litigation *against the other*," Ambush properly filed his intervention motion in the Domenech Action. Asserting a claim for fees from a fund which, if successful, will indirectly impact another party's claim to the same fund is not equivalent to asserting a claim against that party. Accordingly, the USBC did not err as to Ambush's intervention motion.

C. The 2015 Action

13

Next, in 2015, Ambush filed a twelve-count complaint against ACCJ asserting breach (four counts) and RICO violations (seven counts). As far as the Court can tell, the breach allegations arise out of the Settlement Agreement, but the RICO allegations for the most part do not touch upon the Agreement or its subject matter, the *Franqui* Action, claims related to which the Agreement releases. *See supra*. As such, the USBC found, no count in the 2015 Action gives rise to liquidated damages. I address each group of counts in turn.

      i.      <u>The Breach Allegations</u>

To begin, the USBC rejected ACCJ's argument that the first four counts in the 2015 Action, all of which allege breach of the Settlement Agreement, somehow violate the Settlement Agreement. Case No. 18-01273, ECF No. 82, at 20. In its view, this conclusion follows from Paragraph 6 of the Agreement, which provides that "[a]ny action to enforce the remedy provided under this Paragraph 6 shall be filed in the United States District Court assigned to the judge of that Court who presided over [*ACCJ v. Ambush*]," and from the "common-sense position that an action to enforce a settlement agreement cannot be a breach of that agreement." *Id.* I agree with the USBC's reasoning: it is "nonsensical" for ACCJ to argue that "the terms of [the] settlement agreement prevent either party from litigating its enforcement." *Shanley v. Cadle*, 573 Fed. App'x. 6, 10 (1st Cir. 2014) ("A settling party has the right to litigate an alleged breach of the agreement."); *Fid. & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1, 5 (1st Cir. 2008) ("[A] party to a settlement agreement may seek to enforce the agreement's terms when the other party refuses to comply.") (citation omitted); *In re Quality Botanical Ingredients, Inc.*, 249 B.R. 619, 629 (Bankr. D.N.J. 2000) (holding that breach of settlement agreement "gives the aggrieved party the right to file a separate action on the agreement") (citations omitted); *Apple Corps. Ltd. v. Int'l Collectors Soc.*, 15 F. Supp. 2d 456, 470 (D.N.J. 1998) (same); *see also Sawka v. Healtheast, Inc.*,

989 F.2d 138, 140-41 (3d Cir. 1993); *The Cuneo Law Group, P.C. v. Joseph*, 669 F. Supp. 2d 99, 119 (D.D.C. 2009) ("If a party breaches the settlement agreement, the non-breaching party may choose either to enforce the agreement or to rescind it and sue on the original claims.").

ACCJ responds that Ambush did not win in the 2015 Action, implying that his ultimate failure to prove his case vitiated his ability to pursue it in the first place. ACCJ offers no legal authority for this position, which would retroactively penalize a party for using the judicial system to vindicate its purported contractual rights and require it to know for certain if it will succeed before filing suit. Case No. 18-01273, at 20. More importantly, ACCJ's position calls into question the strong public policy encouraging settlement agreements, and may even incentivize breaches when a party deems it no longer beneficial to comply with an agreement it entered. *Federal Trade Comm'n v. Actavis, Inc.*, 133 S.Ct. 2223, 2226 (2013) (collecting cases recognizing "a general legal policy favoring the settlement of disputes"); *D.R. v. East Brunswick Bd. of Educ.*, 109 F.3d 896, 901 (3d Cir. 1997) ("[P]ublic policy wisely encourages settlements.") (quoting *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994)). Lacking any evidence that Ambush's claims were frivolous or sanctionable, ACCJ offers only its *ipse dixit* that the 2015 Action was "nothing more than [a] grandiose fishing expedition . . . devoid of even a scintilla of factual support." ACCJ Br., at 27. That is insufficient. Accordingly, I **AFFIRM** the USBC's determination that the breach claims in the 2015 Action do not violate the Settlement Agreement.

      ii.      <u>The RICO Allegations</u>

The USBC also found that the RICO claims in the 2015 Action do not violate the Settlement Agreement, even though they are "unartfully drafted," "nearly indecipherable," and "clearly an attempt [ ] to enhance [the] damage claim beyond the liquidated damages" provision in the Settlement Agreement. Case No. 18-01273, ECF No. 82, at 22. To violate the Agreement,

ACCJ or Ambush must file a claim against the other *and* the claim must "arise out of or [be] related to the subject matter of the *Franqui* Litigation or the services performed by any of the Parties in connection [therewith]." According to the USBC, while Ambush's RICO allegations constitute "claims against" ACCJ in the sense of the Settlement Agreement, in general they involve unrelated facts/events, some of which apparently occurred years after the parties signed the Agreement. Indeed, Ambush alleges illegal business operations meant to benefit ACCJ principals, representing a client after her death contrary to her wishes, practicing law without a license, lying under oath, improper actions in a case captioned *Higgins v. Iran*, which is separate from the *Franqui* Action, and improper actions in a case involving a New York City terrorist attack in 2005, also separate from *Franqui*. *See supra*. On appeal, ACCJ fails to point to any specific averment or allegation in the RICO counts to buttress its position that the RICO claims nevertheless derive from the same transactions as *Franqui* or otherwise seek to litigate a released claim. *Cf.* ACCJ Br., at 34 (pointing only to a general assertion at the beginning of the complaint that the RICO claims "arise out of facts and events closely related to the [breach] cause of action"). At their closest, according to the rambling Complaint, the events underlying the RICO claims involve the same "*modus operandi*" as the *Franqui* Action. Because the Settlement Agreement "did not provide a general release of claims between ACCJ and Ambush," but only a release of claims related to the *Franqui* Action, and by all accounts the RICO allegations (insofar as they are comprehensible) predominantly concern actions taken outside of that context, I **AFFIRM** the USBC's determination here as well.

> D.  The Chapter 11 Claim

Finally, the USBC construed Ambush's $31.8 million claim, filed in ACCJ's Chapter 11 proceeding, as "part and parcel" of his 2015 Action, and thus declined to deem it a separate potential breach. Case No. 18-01273, ECF No. 82, at 14. ACCJ disagrees, arguing that Ambush's

16

filing the claim forced it to respond "just as someone served with a lawsuit must respond, or else lose by default, since a proof of claim is *prima facie* evidence of the claim's validity and amount, plus incur "thousands of dollars" in attorney fees. ACCJ Br., at 36-38. Although the parties do not point to any case law on this issue, traditional contract law provides a helpful analogy, and dictates that ACCJ is incorrect. As a rule, "[n]one can recover compensation twice in respect of the same injury." *The Atlas*, 93 U.S. 302, 310 (1876); *Fineman v. Armstrong World Industries, Inc.,* 980 F.2d 171, 218 (3d Cir. 1992) (same); 25 C.J.S. Damages § 11 ("The overlapping of damages is generally not permissible, and a person is not entitled to recover twice for the same elements of damage growing out of the same occurrence or event."). In turn, "a plaintiff whose case concerns a single course of conduct and a single injury may not recover those profits twice or thrice over for each legal theory advanced in favor of liability." *Hailey v. City of Camden*, 650 F.Supp.2d 349, 357 (D.N.J. 2009) (quotations omitted); *Clean Jersey Solar, L.L.C. v. Effisolar Energy Corp.*, No. 12-2008, 2015 WL 5007816, at *3 (D.N.J. Aug. 20, 2015) (same), *aff'd sub nom.*, 658 Fed. App'x. 156 (3d Cir. 2016). This common law principle counsels in favor of the USBC's decision here. In filing his Chapter 11 claim by attaching the complaint from his 2015 Action and adding nothing more, Ambush sought to advance the same twelve counts and theories of breach, litigate the same alleged misconduct, and recover once for the same injuries. The Chapter 11 claim is coextensive with the 2015 Action in this sense; it does not constitute an action on top of another action charging ACCJ with different liability. The fact that Ambush sought his remedy in a different forum, while perhaps costly for ACCJ, results from ACCJ's Chapter 11 proceeding, which stayed Ambush's 2015 Action, forestalling his opportunity to pursue his recovery there. I therefore **AFFIRM** the

USBC's finding that Ambush did not separately breach the Settlement Agreement when he filed a fundamentally identical claim in ACCJ's bankruptcy case as in the district court in D.C.[4]

### IV. CONCLUSION

For the foregoing reasons, I **AFFIRM** the USBC's Order rejecting ACCJ's counterclaim and **DISMISS** ACCJ's appeal.

**DATED**: December 3, 2021

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge

---

[4] Because I do not find in favor of ACCJ with respect to any alleged breach, I need not address its related claim that "[e]very separate count of the complaint [in the 2015 Action] is a separate 'claim'" in the sense of the Settlement Agreement.